UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MUSCO PROPANE, LLP | : | NO.: 3:10-CV-1400 (JCH) |
| | : | |
| v. | : | |
| | : | |
| TOWN OF WOLCOTT, TOWN OF | : | |
| WOLCOTT PLANNING AND ZONING | : | |
| COMMISSION, TOWN OF WOLCOTT | : | **FEBRUARY 29, 2012** |
| ZONING BOARD OF APPEALS, MAYOR | : | |
| THOMAS G. DUNN, DAVID KALINOWSKI, | : | |
| RAYMOND MAHONEY, SAMUEL ZOTTO, | : | |
| PETER CARMODY, CATHE SHERMAN, | : | |
| WILLIAM OLMSTEAD, STEVEN GRANT, | : | |
| BRETT MUCCINO, PAUL MAZUREK | : | |
| And JOHN JONES | : | |

**DEFENDANTS' MOTION IN LIMINE SEEKING TO DISQUALIFY PLAINTIFF'S PROPOSED EXPERT, JOSEPH A. DECUSATI, CPA AND PRECLUDE HIS TESTIMONY AND REPORT**

Pursuant to this Court's Order on Pretrial Deadlines, Fed. R. Evid. 401, 403, 702 and 70, the **TOWN OF WOLCOTT** (the "Town"), **WOLCOTT PLANNING AND ZONING COMMISSION, WOLCOTT ZONING BOARD OF APPEALS, THOMAS G. DUNN, DAVID KALINOWSKI, RAYMOND MAHONEY, SAMUEL ZOTTO, PETER CARMODY, CATHE SHERMAN, WILLIAM OLMSTEAD, STEVEN GRANT, BRETT MUCCINO, PAUL MAZUREK** and **JOHN JONES** (hereinafter collectively "the Defendants"), hereby move to disqualify Plaintiff's proposed expert, Joseph A. DeCusati, CPA

and preclude his testimony and report in its entirety.

## I. PRELIMINARY STATEMENT

Musco Propane, LLP filed a Second Amended Complaint dated August 25, 2011 against the Town, its Mayor, and its zoning authorities alleging that the Town's denial of Musco's site-plan applications and issuance of a cease and desist order violated Musco's First and Fourteenth Amendment rights. *See generally* **Second Am. Compl**.  In connection with those claims, the Plaintiff is seeking damages, for *inter alia,* lost profits caused by the cease and desist order as well as future profits as a result of the denial of the additional 30,000 tank.

On April 1, 2011, the Plaintiff disclosed Joseph DeCusati, CPA as an expert witness in this case and provided an expert witness disclosure to support Plaintiff's claim for damages. *See* **Exhibit A, DeCusati Expert Witness Report**.  Defendants respectfully request that this Court disqualify DeCusati from testifying as an expert witness and preclude his report for the following reasons:  1) Musco's Financial Data is Unreliable; 2) Plaintiff's expert's use of the "before and after" damages assessment is unreliable and unsubstantiated; 3) Mr. DeCusati's general methodology and other foundation are unsubstantiated, not generally accepted, and unsound**.**  These points are addressed collectively.

## III. SUMMARY OF DECUSATI EXPERT WITNESS REPORT AND TESTIMONY

The purpose of DeCusati's engagement was to provide an estimate of the present value of Plaintiff's damages. **Exhibit A, p 2.** He relied on the tax returns of an entity called "Musco Propane, L.L.C." Further, as discussed below, Musco Propane appears to employ no

employees.  In an accounting slight of hand, all "Propane" employees actually work for, and are paid by an entity known as "Musco Fuel and Heating , L.L.C." This entity is not a party to the litigation, but pays all of Musco' Propane's labor expenses.  This results in absurdly high profit margins. As such the underlying data in fundamentally unreliable.

In estimating economic loss, DeCusati utilized a hybrid "before and after" methodology.  Essentially, under this theory, one would look at earnings before and earnings after and to the extent there is a loss, the assumption is that the losses result from the wrongful activity.  **Exhibit A, p. 2.** DeCusati supplemented this loss with estimates of lost business opportunities.  As discussed below, the assessment and many assumptions are inherently unreliable, and are no more than a "guess."

Finally, Mr. DeCusati relies on a report prepared by an industry lobbyist named Michael Morrissey.  Mr. Morrissey report and opinions are sheer conjecture.  As such, they are not of a type reasonably relied upon by experts in the field, and should be disallowed (as should DeCusati's resulting conclusions) pursuant to FRE 703.

In making his conclusions, DeCusati makes the following assumptions:  (1) that it is assumed that but-for the alleged actions of the Defendants beginning in March 2010, the Plaintiff would not have experienced economic damages relating to its business relationships. In doing so, De Cusati relied primarily on the partnership's tax returns for the years ending December 2003, 2004, 2005, 2006, 2007, 2008, 2009 and 2010; (2) that the Plaintiff is successful in proving that the Defendants have caused economic damages and that their actions

were wrongful; and (3) the plaintiff's assertion that there is sufficient demand in the dealer market for an additional 30,000 gallon propane tank is assumed to be accurate.

### IV. SUMMARY OF REPORT OF DEFENDANTS' EXPERT, J. ALLEN KOSOWSKY, CPA

On November 1, 2011, Defendants disclosed their expert, J. Allen Kosowsky, CPA/ABV. Mr. Koswosky opined, inter alia, that the damages analysis is fatally flawed because **:** 1) Musco Propane's Financial data is unreliable; 2) competitors were not evaluated; 3) capacity claims are unsubstantiated and unexplored; 4) spot market analysis is unsubstantiated; 5) Cost of storage and potential increased demand were unexamined and the resulting opinions lack foundation; 6) Increased demand based on Morrissey's "references" is speculative; 7) Plaintiff' failed to substantiate hedging practices (which in fact did not occur); 8) Musco has suffered no damages since it made more money in 2010 than in 2009; 9) Mr. DeCusati's reliance on Mr. Morrisey's report was unreasonable; 10) Mr. Morrissey acted as an advocate, not an expert; 11) Sales volume was unaffected by the "cease and desist". *See* **Koswosky Expert Report, Exhibit B.**

### V. LAW AND ARGUMENT

#### A. Legal Standard

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v.*

*Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A motion *in limine* to preclude evidence calls on the court to make a preliminary determination on the admissibility of the evidence under Rule 104 of the Federal Rules of Evidence." *Commerce Funding Corp. Comprehensive Habilitation Servs., Inc.*, No. 01-CV-3796, 2004 WL 1970144, at *4 (S.D.N.Y. Sept. 3, 2004)(citing Fed. R. Evid. 104(a)). The determination of admissibility is a question of law for the court. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 (1993).

The Federal Rules of Evidence assign to the trial court the task of performing a "gatekeeping" function with respect to expert testimony. *See* Advisory Committee Notes, 2000 Amendments, Fed.R.Evid. 702 (trial judges have "the responsibility of acting as gatekeepers to exclude unreliable expert testimony."). Rule 702 of the Federal Rules of Evidence provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "establishes a standard of evidentiary reliability," *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786, and "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 592, 113 S.Ct. 2786; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

In determining the admissibility of expert testimony, whether based on "scientific," "technical" or "other specialized knowledge," the Supreme Court has adopted a two-step inquiry under which trial judges must determine "whether the reasoning or methodology underlying the [expert's] testimony is ... valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 592-93, 113 S.Ct. 2786; *see also Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167; *Koppell v. New York State Board of Elections,* 97 F.Supp.2d 477, 479 (S.D.N.Y.2000); *Cayuga Indian Nation of New York v. Pataki,* 83 F.Supp.2d 318 (N.D.N.Y.2000). Specifically, the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786; *see Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony ... is not only relevant, but reliable.") (internal quotation marks and citation omitted).  *See Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.*, 150 F. Supp. 2d 360, 362-63 (D. Conn. 2001).

Accordingly, before admitting expert testimony, the Court must undertake a three-part analysis to ensure that: (1) the witness is qualified to be an expert; (2) the expert's opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will assist the trier of fact. *See Nimely v. Cty of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

For the reasons that follow, this Court should disqualify DeCusati from testifying as an expert witness and preclude his expert witness report.

**B.     Plaintiff's Financial Data is Unreliable**

It is the most basic accounting principal that profits are derived by subtracting expenses from revenue.  Profits are defined, "most commonly, the gross proceeds of a business transaction less the costs of the transaction; *i.e.* net proceeds.  Excess of revenues over expenses for a transaction; sometimes used synonymously with net income for the period.  Gain realized from business or investment over and above expenditures." *Black's Law Dictionary, Sixth Edition* (1990).  Moreover, compensation paid to and received by the employees of a business are, of course, business 'expenses of producing gross receipts' and therefore reduce earnings and profits. *Divine v. C. I. R.*, 500 F.2d 1041, 1051 (2d Cir. 1974).

De Cusati's report exclusively relies upon Musco Propane's tax returns for results of operations for the years 2006 to 2010 and concludes damages based in sunstantially in reliance on this data.  *See* **Exhibit A, pp. 3, 15.**  In addition, Randy Petroniro, Plaintiff's Managing Parter, confirms in his deposition:  "And the way [De Cusati has] calculated all these figures is we've provided him with tax returns."  *See* **Exhibit C, relevant portions of Plaintiff's 30(b)(6) Deposition (Randy Petroniro), p. 90.**

Musco Propane's tax returns for the years 2003 through 2010 shows the income, costs and expense of the company for these years.  *See* **Exhibit D, tax returns for years 2003-2010.**

On those tax returns, there are no salaries and wages for employees, yet there are

7

payments for employee benefits without any employee payments for salaries and wages claimed. Musco Propane's bookkeeper, Tom Ariola, testified at his deposition that the salaries of the employees are shown on Musco Feul's tax returns since the beginning of operations to keep it consistent with one set of insurance coverage, one FICA number and then it's easier to "give reports for when we have audits and stuff of that nature." ***See* Exhibit E, relevant portions of Ariola deposition, p. 26.** Additionally, it would seem obvious that Musco Propane would need employees to run the plant and drive the trucks to deliver propane to its customers. In fact, Mr. Ariola could not specify which employees worked for Musco Propane. ***See* Exhibit E, p. 31-32.** In fact, Mr. Ariola conceded that he is unable to discern what fraction of time is spent on Musco Propane as opposed to Musco Fuel. ***See* Exhibit E, p. 37**. Moreover, he admitted that the employees were not doing 100% of their work for Musco Fuel. ***See* Exhibit E, p. 37**. While Musco Fuel and Heating's tax returns were not analyzed as part of the De Cusati report, they were requested and disclosed during discovery. The 2010 tax returns show more deduction categories such as salaries and wages. ***See* Exhibit F, Musco Fuel and Heating tax returns for 2010.** In fact, Mr. Ariola admittedly did not provide any of Musco Fuel's tax returns to Mr. DeCusati. ***See* Exhibit D, p. 39-40**. According to Mr. Kosowsky's Report, Musco Fuel lost money in 2009 ($535,300) and 2010 ($395,970).[1] Because Musco Propane's tax returns, exclusively relied upon by DeCusati, do not accurately reflect the actual

---

[1] Mr. Ariola's tax returns are inherently unreliable given that in 2009, he pled guilty to eliciting the acceptance of a bribe. ***See* Exhibit D, pp. 6-7.**

costs incurred by the plaintiff, its base line profits are per se inflated, and the data inherently unreliable. Therefore, because the underlying documents fail to demonstrate an accurate picture, the report and the expert's conclusions are themselves unreliable. *Nimely v. Cty of New York*, 414 F.3d 381, 396 (2d Cir. 2005).

### C. DeCusati's Use of "Before and After" Theory is Unreliable[2].

DeCusati's calculation of damages rests on the "before and after" method. ***See* DeCusati Expert Report, p. 10.** That method compares profits earned before the alleged wrongful act or event to profits after the occurrence to illustrate that "but for" the alleged act or event, the business would have earned the profit that it had earned in the past and that, by virtue of the alleged acts, the Plaintiff has been deprived of some or all of those economic profits. *Id.* Even the DeCusati report concedes: "This method is suitable if the subject business has an established pattern of activity or track record, and assumes the plaintiff can show the sole (or at least the major) cause of the loss of earnings or profits was because of Defendant's activity." *Id.* Because this is not the acceptable method in this case as other factors were not addressed that could have affected his alleged lost earnings in his propane sales, his findings are unreliable.

### 1. Lost Profits – Cease and Desist

---

[2] This appears to be a hybrid methodology, since the before and after profits for the cease and desist period contain an unsubstantiated ".20" profit margin provided by Petroniro. In other words, rather than simply measuring profits before and profits after, plaintiff alters that methodology in favor of an untested, fabricated methodology.

Musco, through DeCustati, asserts that it suffered lost profits in the "cease and desist period." ***See*, Exhibit A, p. 17.** This contention is based on the argument that the dealer sold approximately 40,000 gallons less from March 22, 2010 to October 13, 2010 than it had for the corresponding period the prior year. Plaintiff estimates an "incremental profit" of $ .1545 per gallon. As such, plaintiff claims lost profits in the cease and desist period of $6,102.

Aside from the fact that this analysis is not even a true "before/after" assessment, and leaving aside that one can not cherry pick costs for select gallons, the methodology is flawed. No where does plaintiff address increased demand by any other factor that the customer base "reduced purchases" because they were afraid of the cease and desist. No where does Mr. DeCusati explore any other reasons: a warmer spring, lower prices of substitute heating fuels, alterations in home heating due to federal law changes, new competitors or any other factor beside the self-serving hypothesis of Randy Petrinaro.

Likewise, plaintiff assessed purportedly decreased demand (based on customers cutting back due to Musco's "legal troubles") for the post cease and desist period. In this calculation, DeCusati's initial estimate of decreased gallons sold (due to the "illegal" cease and desist) is 116,201.5. In this case, again rather than looking at "lost profits", Mr. DeCusati makes up a new formula, in which these gallons would have miraculously engendered a $.3955 profit. Mr. DeCusati again declares lost profits for the post cease and desist period (through March 14,

2011) of $45, 958[3].  He takes no account of weather patterns, availability of substitute sources, trends in the industry, or any other reason for decreased demand.  This hybrid "before and after" method is wholly unsound, and is "junk-math."

For example, in Intimate Bookshop v. Barnes and Noble, Inc., 98 CIV.5564 (WHP), 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003), the plaintiff brought a price discrimination claim pursuant to the Clayton Act.  In connection with defendants' summary judgment motion, Defendants argued that the plaintiff could not demonstrate that its lost sales and profits were causally related to the alleged discriminatory sales, that the decline in its business was not attributable to other causes and that it failed to disaggregate defendants' lawful and unlawful conduct, the conduct of multiple defendants and alternative, non-actionable causes of harm.  Id. at * 5.  In order to support its claim for damages, the plaintiff offered the testimony of a number of experts.  Each expert testified that they could not establish any causal link between the plaintiff's lost sales and profits and defendants' alleged receipt of unlawful discounts and their damages calculations and opinions are based merely on assumption that the defendants' alleged violations of the Act were the sole cause of the plaintiff's lost sales and profits.  Id. at * 6.  Third, the plaintiff failed to provide any evidence that the alleged violation of the Act as opposed to other intervening market factors caused loss sales and profits.  Id. The court rejected this evidence.  In doing so, it reasoned:

---

[3] Part of this is based on increased costs due to inability to get the same pricing from the Northeast Pipeline.  Mr. DeCusati failed to note that the pipeline "failed" and was closed during this period.  ***See* Exhibit B, p. 9 and fn 28.**

> As noted, Inmate's unsupported assumption of causation and supposition that all of its losses were caused by defendants' allegedly unlawful conduct, and failure to account for defendants' lawful conduct and intervening market factors are fatal to its claim. As evidenced by Inmate's experts' testimony, Inmate's survey and damages models are impermissibly fraught with assumptions and speculation, which unquestionably fail to show that the alleged discriminatory prices the defendants received caused Inmate actual injury. This failure to prove a causal link is especially highlighted by Inmate's wholesale failure to account for other intervening market factors in its damages calculation….(internal citations omitted).

Id. at * 8

In McGlinchy v. Shell Chem. Co., 845 F.2d 802 (9th Cir. 1988), the plaintiff brought an action against a chemical company and its affiliates for antitrust violations, breach of contract and related torts. Id. at 806. The court excluded the plaintiff's expert witness report and future testimony by the expert witness, on a number of grounds. In doing so, the court concluded:

> Even as a "before and after" assessment of appellants' damages from a hypothetical injury, [the expert's] study was hopelessly flawed. He did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred. (internal quotations omitted).

Id. at 807.

In Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1200 (9th Cir. 1975), the plaintiffs attempted to demonstrate lost profits in an antitrust case on a "before and

after" theory.  While in that case, the court held that the plaintiff met its burden, the court articulated its limitation on the use of that theory of damages:

> Plaintiffs' method of measuring damages, known as the 'before and after' theory, may be used only where there has been some showing that the market conditions in the two periods were similar but for the impact of the violation. *See Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 259-63, 66 S.Ct. 574, 90 L.Ed. 652 (1946). While this test would not allow a verdict to rest on bare allegations of lost profits and causation, the Supreme Court also ruled in *Bigelow* that:. . . (I)n the absence of more precise proof, the jury could (infer) from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.
> Id. at 264, 66 S.Ct. at 579.

Id. at 1206-07.

### 2. Lost Profits – Spot Purchases

Plaintiff asserts another class of lost profits based on the increased price of buying at "spot" rather than through a "hedge."  According to Mr. DeCusati, "Musco alleges that these spot purchases would not be necessary if the cease and desist order were not in place.  See, DeCusati Report, p. 19.  DeCusati conducts no analaysis of this factual contention, and takes it at face value.

DeCusati assumes that the cease and desist caused decreased demand, that the decreased demand caused less "allocation" from the pipe line, and as such, Musco had to pay $

.2890 per gallon more for its spot purchases. Decusati performed no economic assessement, and the calutations as sheer conjecture. More over, plaintiff has now moved far from a before and after theory, since: a) Musco made more profits in 2010 than in 2009; and 2) his analysis in this regard simply cherry picks part of his business opportunity. The assessment is wholly unreliable. Further, as noted above, the pipeline failed during portions of this period. It is unknown how that failure affected Musco's allocation.

### 3. Damages – Increased "Opportunity Costs"

Plaintiff offers additional damages based on its assertion that the cease and desist prevented it from buying a storage tank. That used storage tank would have cost $10,000. Mr. Petraniro told DeCusati that similar used tanks cost $91,025. DeCusati does not appear to have verified it, but concluded nonetheless that Musco "lost" $81,025 due to the cease and desist.

The argument is unfounded, since Musco could have easily bought the item; it simply could not have used it to store propane at the business site. The Town never precluded the purchase.

Additionally, as noted by Mr. Kowosky, the figure is in error because the putative purchaser of the tank was Musco Fuel, not Musco Propane; Musco Propane was not a party to the contract. Further, the "profits" fail to include the cost of delivery and cost of set up. Finally, the deal appears to have fallen through in 2009; the constitutional tort alleged in this case occurred in 2010. **See, Exhibit B, p. 4, fn. 7.**

This assessment should be precluded.

### 4. Projected Future Loss

DeCusati's report suggests that given the success experienced in the past, Musco is "confident" that its "hedging"[4] activities will continue to be successful in garnering additional profit margin. His report states that "the capacity to purchase an additional 30,000 gallons at reduced prices will serve to benefit the Company through increased profit margins." **See Exhibit A, p. 20.** Second, DeCusati relies on the opinion of T. Michael Morrissey who estimated that Plaintiff would double its sales to dealers within a reasonable geographic radius resulting from an additional 30,000 gallon propane tank. Third, the additional 30,000 tank would allow Musco additional allocations of propane from the pipeline during the winter months, minimizing the premium experienced by Musco for its purchases made on the spot market.

### a. Bias of Morrissey

As more fully set forth in the accompanying motion in *limine* seeking to disqualify Plaintiff's expert T. Michael Morrissey, Morrissey should also be disqualified and his expert witness report be precluded because: (1) Morrissey's conclusion that Musco is a "retailer" is a legal conclusion; (2) Morrissey's reliance on loss allocation ratio is speculative; and (3) Morrissey is biased and is Musco's advocate. Defendants refer to that motion for a more

---

[4] Defendant's experts note a complete absence of any options contracts purchased by Musco Propane LLC or Musco Propane LLP. Absent options, there is no hedging; one wonders what that term is being used to describe.

detailed argument regarding Morrissey's theories and bias. Based upon Morrissey's role and what he stands to gain by Musco Propane's success in this litigation and based upon the fact that it is misleading and unreliable, this Court should disqualify Morrissey and his report on the ground of unreliability. *See In re Med Diversified, Inc.*, 346 B.R. 621, 642 (Bankr. E.D.N.Y. 2006). Moreover, because DeCusati relied upon his report in making his opinions, DeCusati's report is unreliable.

Mr. Morrissey's deposition is replete with instances where he admitted that he did not perform the substantive analysis to support his opinion. Rather, when questioned, he admitted that many of the opinions were based upon his views of what "might" have happened. For instance, he stated that the market was growing and that he was prepared to send customers to Musco Propane but wouldn't send him customers if they did not have a 90,000 gallon plant. *See* **Exhibit G, pp. 80-82.** However, Plaintiff requested zoning approval for a 30,000 gallon tank and already had a 30,000 gallon tank. *See* **Exhibit C, pp. 44-45, 80, 84-85.** Therefore, had Plaintiff's request for an additional 30,000 gallon tank been granted, Plaintiff would have been a 60,000 gallon tank and not a 90,000 gallon tank which would result in an award of customers from Morrissey. For this, and other reasons, Morrissey's report is misleading and unreliable.

### b. Morrissey's Lack of Foundation

Mr. Morrissey lacks an economic or econometric forecasting background to allow him to opine on what Musco's demand would have been in the March 11, 2011 to December 31,

2011 period. As addressed in Mr. Kosowsky's report, the very estimate is no more than sheer conjecture that Mr. Morrisey, Musco's consultant, would have 'steered" additional business to Musco such as would "fill the new tank." Under this speculative and self-serving assessment, Musco lost out on profits.

### c. DeCusati's Conclusions

Using a before/after analysis, Decusati opines that Musco lost out on profits of $227,227. DeCusati makes the simplistic assessment that if capacity doubled, sales would double. Based on a "incremental profit per gallon"[5] of $ .2952, plaintiff "lost" $227,227 during the period. Left unanswered is if, there is such profit to be made, Musco simply didn't lease another site for its tank. Moreover, when assessing that future demand would expand statically in direct proportion to increased capacity, DeCusati failed to address or assess "future weather conditions, market conditions, competitive conditions, customer preferences and operational activities … have not been examined, analyzed or documents." Kosowsky Report, p. 4.

Mr. DeCusati uses these facts and figures as the foundation for an annual future loss of profits of $321,491, and that though January 1, 2017, future losses total $1,505,164[6].

---

[5] The expert fails to identify from what economic model or forecast this figure is derived.

[6] Further, the Court should preclude such testimony for any period after a verdict would be rendered because should the jury find against the Defendants, in all likelihood an injunction would issue making the future losses moot: Musco would have its tank, and be able to use its market acumen to derive future profits.

This methodology, like its foundation, has no basis in market conditions, fails to address labor and related costs, fails to address competitors and substitutes, and is no more than sheer conjecture.

## VII. <u>CONCLUSION</u>

*Daubert* and its progeny provide the Court with the duty to test "expert" analysis, to make sure its foundation is sound and reliable. If the methodology is reliable, the matter may be admitted and subject to rigorous examination.

In this case, the methodology is unsound. DeCusati uses neither a before or after method, but a hybrid that is most beneficial to plaintiff. He neither performed, nor relied on any econometric or regression style forecasting to assess future market conditions or demand. He relies universally on plaintiff's own self-serving forecasts, and the unsubstantiated, untested assertions of an industry lobbyist. As noted by Mr. Kosowsky, Musco made more mone in the years after the cease and desist than it did before. Finally, its most critical foundation, the tax returns and subordinate profit and loss statements reflect not a penny for labor costs. Musco asks the Court to allow damages for lost profits to a business that has no labor expenses: all labor is paid through a unrelated side business. The factors are the very essence of unreliable junk science. Plaintiff's expert should be precluded.

                                                         DEFENDANTS,
                                                         TOWN OF WOLCOTT, TOWN OF
                                                         WOLCOTT PLANNING AND ZONING
                                                         COMMISSION, TOWN OF WOLCOTT
                                                         ZONING BOARD OF APPEALS, MAYOR

THOMAS G. DUNN, DAVID KALINOWSKI, RAYMOND MAHONEY, SAMUEL ZOTTO, PETER CARMODY, CATHE SHERMAN, WILLIAM OLMSTEAD, STEVEN GRANT, BRETT MUCCINO, PAUL MAZUREK and JOHN JONES

By  *Melinda Powell*
   Melinda A. Powell (ct17049)
   Michael J. Rose (ct14803)
   Johanna G. Zelman (ct26966)
   Rachel L. Ginsburg (ct28563)
   Robin B. Kallor (ct26536)
   Rose Kallor, LLP
   750 Main Street, Suite 606
   Hartford, CT 06103
   (860) 748-4660
   (860) 241-1547 (Fax)
   E-Mail: mpowell@rosekallor.com
   E-Mail: mrose@rosekallor.com
   E-Mail: jzelman@rosekallor.com
   E-Mail: rginsburg@rosekallor.com
   E-Mail: rkallor@rosekallor.com

## **CERTIFICATION**

This is to certify that a copy of the foregoing was filed electronically to the following counsel of record this 29th day of February, 2012. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Eric M. Grant, Esq.
Pasquale M. Salvatore, Esq.
Melissa A. Scozzafava, Esq.
Yamin & Grant, LLC
83 Bank Street
Waterbury, CT 06702

                                              *Melinda Powell*
                                         Melinda A. Powell
                                         Michael J. Rose
                                         Johanna G. Zelman
                                         Rachel L. Ginsburg
                                         Robin B. Kallor